NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DAVID R. ANDINO<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>Defendant. | Civil Action No.: 12-5476 (PGS)<br><br>MEMORANDUM AND ORDER |

**SHERIDAN, U.S.D.J.**

This matter is before the Court on the appeal of Plaintiff, David R. Andino ("Andino" or "Plaintiff") from the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits. Plaintiff filed a Title II application for a period of disability and disability insurance benefits on December 8, 2008. Plaintiff also filed a Title XVI application for supplemental security income on December 9, 2008. In both applications, the claimant alleged disability beginning on July 1, 2001 due to bipolar disorder, depression, and attention deficit disorder (ADD).

**I.**

The issue before the Court is whether substantial evidence supports the Administrative Law Judge's (ALJ) determination that the medical and psychiatric evidence, as well as Plaintiff's statements, demonstrated that he retained the residual functional capacity ("RFC") to perform work which existed in significant numbers in the national economy from July 1, 2008, his alleged onset of disability date, through November 18, 2010, the date of the ALJ's decision. As plaintiff is representing himself in this matter, the Court is proceeding in a less stringent manner

1

than the ordinary litigant, and plaintiff is entitled to liberal construction of the court's rules. See, *Bryen v. Becker*, 785 F. Supp. 484, 485 (D.N.J. 1991).

Plaintiff is a high school graduate. He dropped out of several programs after high school, including a culinary and a music program. He has held several jobs mostly in food services, the longest lasting four months. He cannot say why he has not been able to maintain employment, except because he "got sick of it," and the he "can't function" at a job, but does not offer examples or reasons why he believes this is the case. As part of Plaintiff's disability application, he completed a function report (R. 223-31). In this report, Plaintiff indicated that he spends time with his six year old daughter, sometimes picking her up from the bus stop; prepares food or meals daily; straightens up the house a little at a time; shops for food and necessities; watches television; and goes to the store and doctor's appointments on a regular basis. (R. 225-28).

A hearing on this matter was held on November 2, 2010, where Plaintiff testified somewhat inconsistently to his previous statements. Plaintiff testified that he was unemployed and he and his family were on public assistance. (R. 48). With regard to his treatment at the time, he was seeing Dr. Caldwell at Ready Care and was taking 50 milligrams of Zoloft, 20 milligrams of Esofex, and Zyrtec (he was not sure on the milligrams). (R. 49). He indicated that he was doing "okay" with the medications. (R. 49). With regard to day-to-day activities Plaintiff testified that he "lays in bed really" and "doesn't do anything." He gets up to eat, and then "mopes around a little bit" and then goes back to bed. He tries to watch television, but he cannot make it through a whole show. Plaintiff also testifies that his daughter walks to and from school every day with her mother. (R.50).

Plaintiff also testified that although he was referred to see a psychiatrist or therapist by Dr. Caldwell, he has not gone because he does not "believe in" psychiatry (R.50). Plaintiff calls

family members and his best friend who is a Deacon in a church, and those act as his psychiatrists. *Id*. He also reads the Bible whenever he can, and that helps sometimes. *Id*. Plaintiff further testified that he very rarely prepares meals at home and the he will help his wife quickly, for five minutes, but then just walk out. (R. 51). This is inconsistent with the function report, where Plaintiff records that he prepares meals daily.

*Medical Reports*

Plaintiff was treated for a "superficial scalp injury" on October 7, 2001. Plaintiff says he was shot at while in his car. He states 3 shots were fired and reported injuries to head as well as other injuries. In June 2004, Plaintiff was evaluated by Behavioral Health Services at Saint Vincent Catholic Medical Center for alcohol abuse. At that time, his Global Assessment of Functioning (GAF) was 55, illustrating that he had moderate symptoms or moderate difficulty in social, occupational, and school functioning. (R. 271). Plaintiff also reported that "alcohol is making him depressed," and he admits to "passive suicide thoughts." (R. 271).

Plaintiff saw Michael Falcione, M.D. ("Dr. Falcione"), of Crossing the Jordan Christian Health Center (Crossing the Jordan), on March 10, 2008, for complaints of gastroesophagel reflux disease (GERD), moderate fatigue, right lower extremity paresthesia, seasonal allergies, and snoring. (R. 326-28). An examination showed positive findings of morbid obesity, a nasal septum/mucosa partially obscured by clear drainage, gray and retracted tympanic membranes (eardrums), trace pedal edema, and "spider veins" on the legs (R. 327). Plaintiff was oriented to person, place, and time. (R. 327). Also, his insight and judgment were fair. (R. 327).

On March 18, 2008, a progress note from Crossing the Jordan Health Center indicated that plaintiff was tested for sexually transmitted diseases due to his high risk sexual behavior. (R. 325). A gastrointestinal endoscopy report, dated March 25, 2008, revealed that Plaintiff had a

small hiatal hernia. Plaintiff was next evaluated on March 31, 2008 at The Washington Hospital – Sleep Center, by Charles M. Koliner, M.D. Dr. Koliner diagnosed Plaintiff with "possible effect of increased upper away resistance" and "sleep scheduling disorder most likely." (R. 280-282, repeated at 432-33).

On April 7, 2008 Plaintiff went to The Washing Hospital emergency room complaining of food poisoning. (R. 288-95; repeated at R. 283-87). The examining doctor diagnosed acute gastritis. (R. 294). On April 23, 2008 Plaintiff was seen at Crossing the Jordan with generalized abdominal pain and was assessed with viral gastritis (R. 323-24). Then on July 17, 2008, nurse practitioner Linda Clemons ("NP Clemons") and Dr. Falcione completed a questionnaire on which they opined that plaintiff was temporarily incapacitated for a six-month period through January 16, 2009. (R. 419-20). Plaintiff was diagnosed with major depression and anxiety, and Plaintiff was to follow a prescribed treatment plan. (R. 420). Clemons also evaluated Plaintiff for depression, noting that Plaintiff was in no acute distress, and he was anxious, tearful, and avoided eye contact. (R. 321-22). On September 8, November 5, and December 16, 2008, NP Clemons further evaluated Plaintiff for complaints of worsening depression. (R. 315-20). NP Clemons found that Plaintiff was in no acute distress, and his affect and demeanor were appropriate. (R. 315, 317, 319). At this time, he was prescribed Celexa, an anti-depressant. (R. 316, 318, 320).

On March 24, 2009, Plaintiff was psychologically evaluated by Sandy Vujnovic, Ph.D. ("Dr. Vujnovic). Dr Vujnovic found that Plaintiff's responses to questions were vague and lacked detail. (R. 357). Plaintiff reported having a "break down" the prior year, but he was unable to describe what happened and could only share that he was "scared of everything". (R. 357). Plaintiff also reported that he had started and stopped psychotherapy multiple times, while

4

noting that he "never followed up with anything". (R. 357). Plaintiff was taking Lexapro, which was prescribed by a family physician. (R. 357). Plaintiff also reported sleep reversal and tearfulness. (R. 357). Dr. Vujnovic repeatedly questioned Plaintiff about his depression and his anxiety issues, but the Plaintiff could not give any specific reason for "getting scared". (R. 357). Plaintiff did report that his mother was a nurse and told him that he was bipolar, but Plaintiff did not offer any symptoms that are consistent with a mood disorder. (R. 357). Plaintiff further reported that he had untreated ADD as a child and when Dr. Vujnovic asked why his mother did not pursue an evaluation or treatment for his ADD, he could not provide an answer. *Id*.

Dr. Vujnovic concluded that it was difficult to assess and diagnose Plaintiff because of his unwillingness or inability to provide detailed information. (R. 360-62). Plaintiff appeared to be minimizing past problems with alcohol abuse and the extent of family and marital stressors. (R. 358, 360). Dr. Vujnovic diagnosed Plaintiff with dysthymic disorder and personality disorder, while indicating that both conditions appeared to impair Plaintiff in social and vocational functioning. (R. 360). However, Dr. Vujnovic indicated that plaintiff was able to understand, remember, and carry out both simple and detailed instructions. (R. 361). Plaintiff could make judgments on simple work-related decisions and he had only slight restriction in his ability to interact appropriately with the public. (R. 361). Finally, Plaintiff was moderately restricted in responding appropriately to work pressures and changes in a routine work setting. (R. 361).

On April 27, 2009, Plaintiff returned to Crossing the Jordan complaining of severe depression. (R. 410-11). He indicated that he had worsening anger and fleeting thoughts of suicide, and that his medication (Celexa) was not working. (R. 410). NP Clemons examined Plaintiff, and noted that he was in no apparent distress, and his mood was depressed and his

5

affect was flat (R. 410). Plaintiff was prescribed Zoloft by nurse practitioner Clemons. (R. 410-11). On May 11, 2009 Plaintiff went to Crossing the Jordan with cold symptoms (R. 408-09). NP Clemons noted that Plaintiff's demeanor and affect were appropriate and she prescribed him prednisone, a cortisteroid. (R. 408-09). On May 19, 2009, nurse practitioner Clemons saw plaintiff again for complaints of contact dermatitits. (R. 406-07). Upon examination, Plaintiff had a diffuse, mainly pink rash with some scabbing. (R. 406). Plaintiff was in no apparent distress and his demeanor and affect were appropriate. (R. 406). In a May 19, 2009 employability assessment form, nurse practitioner Clemons indicated that plaintiff was temporarily disabled for less than twelve months, through November 30, 2009, due to sever depression and bipolar disorder. (R. 412-22). Then, in an October 8, 2009 employability assessment form, nurse practitioner Clemons indicated that Plaintiff was temporarily disabled for less than twelve months, through August 30, 2010, due to sever depression and bipolar disorder.

On June 24, 2010, Plaintiff was examined by Kumar Patel, M.D. ("Dr. Patel) for an allergy/immunology consultation. (R. 399-400). Plaintiff complained of four or five episodes of skin eruptions within the last two years, as well as nasal congestion, clear mucus rhinorrhea, postnasal drainage, and sneezing. (R. 399). Dr. Patel indicated that Plaintiff's complaints were vague, but he though that the rashes were an allergic reaction of some sort. (R. 400). For Plaintiff's allergy symptoms, Dr. Patel recommended aggressive nasal saline spray washed, followed by Flonase, which is used to treat nasal symptoms, as well as antihistamine therapy. (R. 400).

On July 16, 2010, Douglas Caldwell, M.D. indicated that Plaintiff was temporally disabled through January 31, 2011 (R. 427-29). Dr. Caldwell listed diagnoses of bipolar disorder, sleep apnea, severe allergies, GERD, and recovering alcoholic. (R. 428).

Psychiatric Review

On April 6, 2009 State agency review psychologist Grant W. Coyle, Ph.D. ("Dr. Coyle") completed two psychiatric review technique forms. (R. 369-98). Dr. Coyle indicated in one review that Plaintiff had a medically determinable mental impairment prior to the date he was last insured for disability insurance benefits, March 31, 2004. (R.386-98). Dr. Coyle reviewed Plaintiff's impairments under Listing sections 12.04 (Affective Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders), and concluded that Plaintiff's impairments did not meet or equal the criteria of any listing. (R. 372, 375, 379-80). He indicated that Plaintiff had moderate limitations in activities of daily living; maintaining social functioning; and in concentration, persistence, or pace. (R. 382). Plaintiff had no episodes of decompensation, each of extended duration. (R. 382).

Residual Functional Capacity Assessment

Dr. Coyle indicated that Plaintiff had no significant limitation in sub-categories of understanding and memory. (R. 369). Plaintiff had no significant to moderate limitations in sub-categories of sustained concentration and persistence, social interaction, and adaptation. (R. 369-70). He found that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis.

## II.

Legal Standard for Disability

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. §423(d)(2)(A); see *Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The act requires an individualized determination of each plaintiff's disability based on evidence adduced at hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); see 42 U.S.C. §405(b). The act also grants authority to Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability. 20 C.F.R. § 404.1520. First, the plaintiff must establish that he is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied. See *Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)). In step two, if the plaintiff is not working, he must establish that he suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*; *Burnett*, 220 F.3d at 118-20. If it does, the plaintiff is automatically disabled. 20 C.F.R §

404.1520(d). But, the plaintiff will not be found disabled simply because he is unable to perform his previous work. *Id*. In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning. *Burnett*, 220 F. 3d at 119-20. A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review." *Id*. at 119.

If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four. *Plummer*, 186 F. 3d at 428. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform his [or her] past relevant work." *Id*.; *see Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity ("RFC"); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.

If the plaintiff cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. See 20 C.F.R. § 404.1520(g). If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *See Yuckert*, 482 U.S. at 146 n.5; *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids) from Appendix 2 of the regulations, which consider age, physical ability, education, and work experience. 20 C.F.R. §404, subpt. P, app.2. However,

when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett*, 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the grids, including . . . testimony of a vocational expert"). If this evidence establishes that there is work that the plaintiff can perform, then he is not disabled. 20 C.F.R. § 404.1520 (g).

Review of ALJ by District Court

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see also* 42 U.S.C. § 405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation omitted)); see *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where

10

there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 277 n.9

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain type of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)); See *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weight the evidence or substitute its conclusions for those of the factfinder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence. *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. § 401, *et seq*. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely but subjective complaints such as pain. A

11

claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b). *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that the claimant claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony. As a result of the standard, the ALJ failed to utilize a vocational expert at Step 5 as required, and has failed to adequately address the competent evidence presented which is contrary to the ALJ's finding.

**III.**

In this case, the ALJ carefully applied the five-step process outlined above.

At step one of the five-step process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since July 1, 2001, the alleged onset date. The plaintiff did work after the alleged disability onset date as he earned $3,125.62 in 2003; $2,801.22 in 2006 and $3,380.05 in 2007. The ALJ found that these earning did constitute substantial gainful activity, but the jobs were short-lived and ended because of his conditions so they constituted unsuccessful work attempt.

At step two, the ALJ found that Plaintiff had severe impairments of dysthymic disorder and personality disorder. These impairments were found to be "severe" only insofar as they cause more than minimal limitations in the Plaintiff's ability to perform some basic work-related activities. However, at step three, the ALJ found that Plaintiff's impairment did not meet or medically equal one of the listed impairment in 20 C.F.R. part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). At step four, the ALJ

found that Plaintiff could not perform "his past work as a fast food cook which is considered semi-skilled, medium duty work activity." (T. 56, 1-3). The ALJ further found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: no constant/frequent interaction with co-workers and supervisors, but can sustain occasional contact with them, some "moderate degree of impairments . . . in terms of maintaining his concentration, persistence and pace." (T. 56, 17-19). In addition, he can not be exposed to heavy concentration of dust, fumes, gases, or extremes of temperature and humidity. With those limitations, the vocational expert, Ms. Georgio, found Plaintiff could work as a hand packer, sorter, assembly and as a production worker. (T. 58, 1-6).

At the time of the Plaintiff's alleged onset date of disability, Plaintiff was twenty-one years old and is defined as a younger individual (20 CFR 404.1563). Using the medical-vocational rules as a framework for his decision, The ALJ found that taking into consideration Plaintiff's age, education, residual functional capacity and work experience, Plaintiff is capable of performing of finding a job that exists in significant numbers in the national economy.

There is substantial evidence supporting the Commissioner's decision.

The Plaintiff has an alleged disability since July 1, 2001, but the only medical report from 2001 is an emergency room record from October 7, 2001. Many of the Plaintiff's medical records deal with issues other than those in which he is claiming disability. For instance, many of them are welfare forms with no supporting documentation with no relationship to his disability. Furthermore, he has not followed through with treatments and he acknowledges starting and stopping psychotherapy multiple times. Plaintiff testified that he does not believe in psychiatry. Plaintiff also does not provide any reason for why he could not work, except for saying that he "can't function."

Regulations allow the Commissioner to consider claimant's daily activities in evaluating his credibility 20 C.F.R. 404.1529(c)(3)(1). As noted previously, Plaintiff stated that he prepares meals for himself; plays with his daughter; watches television; shops for food and necessities; and has good days and bad days. In social functioning, the claimant has moderate difficulties. He gets along with his family, attends church and prays over the phone with his pastor. He talks with his parents over the phone in New York and they come to visit. Plaintiff does have trouble getting along with people, but he has some friends at his church.

The ALJ found that Plaintiff's testimony was not credible because it varied extensively. The ALJ has discretion to evaluate the credibility of Plaintiff's complaints. *Jenkins v. Commissioner*, 2006 U.S. App. Lexis 21295 (3d Cir. 2006). Credibility determinations are the unique province of a fact finder. See generally *Dardovitch v. Haltzman*, 190 F.3d 125 (3d Cir. 1999) (internal quotation omitted). Inasmuch as the ALJ had the opportunity to observe the demeanor and determine the credibility of Plaintiff, the ALJ's observations on these matters must be given great weight. See *Wier v. Heckler*, 734 F. 2d 955, 962 (3d Cir. 1984). See also, Social Security Ruling 96-7, 20 C.F.R. 404.1529 and 20 C.F.R. 416.969.

A review of the record confirms that Plaintiff's impairments did not medically match or equal one of the listed impairments in 20 CFR part 404, Subparp P, Appendix 1 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Plaintiff does not assert that his condition met or equaled any listed impairment and does not present any medical evidence, which demonstrates that he had an impairment, which met or equaled one of the listings. Furthermore, no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment. Plaintiff has the burden to present medical findings that show his or her impairment matches a listing or is equal to a listed impairment and

14

he has not done so here. See *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 120, n.2 (3d Cir. 2000).

Finally, at steps four and five of the sequential evaluation process, the ALJ determined that Plaintiff could not perform his past relevant work (fast food cook), but, based on the testimony of the vocational expert, he could perform jobs that exist in significant numbers in the national economy, considering his age, education, work experience, and residual functional capacity (20 CFR 404.2579, 404.1569)a), 416.969, and 416.969(a)). The evidence supports the ALJ's decision here. In determining whether the Plaintiff can perform other work, the ALJ must consider Plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. Alternatively, when limitations are non-exertional, a vocational expert must testify that given all of these factors, the individual would be able to perform the requirements of representative occupations. Here the vocational expert found plaintiff could perform certain jobs such as a hand packer, sorter or assembler. Given the evidence in the record regarding Plaintiff's characteristics, the ALJ correctly determined that Plaintiff could perform other jobs that exist in significant numbers in the national economy.

Under all the circumstances and findings, the ALJ's decision is based on substantial evidence.

ORDER

This matter having come before the Court on Plaintiff David Andino's appeal of the Commissioner of the Social Security Administration's final decision denying his application for Disability Insurance Benefits; and the Court having considered all submissions of the parties; and for the reasons stated above;

IT IS on this 5th day of September, 2013

ORDERED that the final decision of the Commissioner of Social Security is affirmed. The case is closed.

*s/Peter G. Sheridan*  
PETER G. SHERIDAN, U.S.D.J.